1

THE HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7     UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
8     AT TACOMA

9   THE WATTLES COMPANY, a Washington           USDC CASE NO. 3:14-cv-05097-RBL
    corporation,
10                                               WATTLES' OPPOSITION TO
              Plaintiff,                         WESTCHESTER DEFENDANTS'
11                                               MOTION FOR SUMMARY JUDGMENT
              v.                                 RE: SUIT LIMITATION
12
    SCOTTSDALE INSURANCE COMPANY, an
    Arizona corporation; *et al.*,               **Date:  September 12, 2014**
13                                               **Time: Oral Argument Requested**
              Defendants.

14

## I.  INTRODUCTION

15
          The Wattles Company ("Wattles") purchased and paid premiums for property insurance
16
    covering its warehouse located at 1901-2005 Fryar Avenue in Sumner, Washington (the
17
    "Building") from 1981 through 2013.   Now, Westchester Fire Insurance Company and
18
    Westchester Surplus Lines Insurance Company f/k/a Industrial Insurance Company of Hawaii
19
    (collectively "Westchester") argue, based on incomplete policies and a misinterpretation of
20
    *Panorama Village* and against public policy and overwhelming case authority, that
21
    Westchester's suit limitation clauses time-bar Wattles' claims for coverage.
22

23

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 1
*USDC CASE NO. 3:14-CV-05097-RBL*
Page 1 of 22



1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

Contrary to Westchester's assertions, Washington courts have not determined when a suit limitation period using the phrase "after inception of a loss" begins to run in cases of ongoing and progressive loss. Were Washington address this issue, it would no doubt apply the rule applied in other jurisdictions that have addressed the question, and hold that an "inception" suit limitation period begins to run when the insured knew or should have known of its insured loss. In other words, Washington, like other jurisdictions, would apply a discovery rule. Even without the discovery rule, however, there are issues of fact, and Westchester's motion for summary judgment should be denied.

## II. STATEMENT OF FACTS

### A. Wattles Leased the Building to Exide for Nearly 30 Years.

Wattles, a local family-owned business, purchased the Building in 1981. *Decl. of Craig Wattles in Opp. to Westchester Defs.' Mot. for Summ. J. Re: Suit Limitations* ("*Wattles Decl.*") at ¶¶ 2-3. From 1981 through 2012, Wattles leased the entire Building to Exide Technologies and its predecessor entities.[1] *Id.* at ¶ 3. Initially, Exide's operations in the Building were limited to battery marketing, processing, and storage and related activities. *Id.* at ¶ 4. In 1984, Exide began battery filling and charging operations at the Building. *Id.* In connection with these operations, a tank of sulfuric acid, which Exide would use to fill the batteries (called an acid farm), was installed in the Building, and also a specific area for charging the batteries (called a formation area). *Id.*

---

[1] Wattles entered into a lease with GWB Corporation in 1981. *Wattles Decl.* at ¶ 3. In 1986, Wattles entered into a new lease with GWB's successor, General Battery Corporation ("GBC"). *Id.* In 1999, the lease was renewed for a 10-year period with GBC's successor, Exide Technologies. *Id.* Because these entities are all related and successors of one another, this Opposition refers to them collectively as "Exide."

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 2

*USDC CASE NO. 3:14-CV-05097-RBL*

Page 2 of 22



1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150 • Fax: 425.284.1147

1    By 1999, the concrete floor in the acid farm and formation areas of the Building had

2    experienced extraordinary wear and tear.  *Id*. at ¶ 5; *Decl. of Scott M. Stickney in Supp. of*

3    *Westchester Defs.' Mot. for Summ. J. Dismissal of Contract-Based Claims Due to Wattles'*

4    *Failure to File Suit Within One Year Suit-Limitation Period* ("*Stickney Decl.*") (Dkt. #77), Ex.

5    4.  Therefore, in connection with a 1999 lease renewal, the lease required that Exide would

6    restore the Building to the condition it was in when Exide began leasing the Building from

7    Wattles in 1981.  *Wattles Decl*. at ¶ 5; *Stickney Decl*., Ex. 4.

8    In connection with its Building restoration duties under the 1999 lease, upon vacating

9    part of the building in 2009, Exide replaced the concrete floors in the formation and acid farm

10   areas and hired PSC Environmental Services, LLC ("PSC") to perform a complete

11   environmental cleaning of the Building and prepare a report upon completion.  *Wattles Decl*. at

12   ¶ 6.  Despite Wattles' repeated requests and demands over the course of more than three years,

13   Exide never provided Wattles with a copy of the final PSC report.  *Id*.

14   **B. After Exide Vacated, Wattles Investigated Potential Building Damage.**

15   In late 2010, a wooden truss in the Building's roof structure cracked.  *Id*. at ¶ 7.  In

16   response, Wattles called Sitts & Hill Engineers ("Sitts & Hill") to examine the cracked truss and

17   to propose a repair plan.  *Id*.   Sitts & Hill recommended shoring the truss, and it did not

18   perform any additional investigation of the Building. *Id*. Wattles purchased the material to

19   perform the truss shoring, and its personnel installed the shoring.  *Id*. at ¶ 8.  At the time,

20   Wattles did not know, and it was not advised, that the cracked truss was anything more than

21   normal building maintenance, or that it may have been related to Exide's tenancy.  *Id*.

22

23

**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150 • Fax: 425.284.1147

Nevertheless, during this time, Exide continued to fail to provide its report from PSC to confirm that it had repaired all Building damage that occurred as a result of Exide's activities during its lease. *Id*. at ¶ 9. Based on Exide's inability to provide the report, coupled with the cracked truss, Wattles first became concerned the Building may have sustained damage during Exide's tenancy beyond just the concrete floor damage. *Id*. However, Wattles did not know either way at that time what additional damage, if any, was sustained. *Id*. Therefore, Wattles undertook to look into the issue independently. *Id*.

Wattles' initial investigation focused on the Building's environmental condition as it may impact indoor air quality, as Wattles did not initially suspect a systemic structural issue. *See id*. at ¶ 10. Wattles retained Environmental Management Services, LLC ("EMS") to complete a limited review of the environmental conditions at the Building as a result of Exide's tenancy. *Id.* at ¶ 11; *Stickney Decl.*, Ex. 7. In its January 28, 2011 report (the "EMS Report"), EMS determined that the "low pH levels found on the surfaces and duct systems at the site constitute a potential problem for the structural integrity of the building." *Stickney Decl.,* Ex. 7. This was the first notice Wattles received of a potential systemic structural issue. *Wattles Decl.* at ¶ 12. Notably, EMS was unable to determine the depth of the damage to the wooden beams in the Building, and recommended further core sampling of the wood beams and cement to determine whether any actual structural issue existed. *Id.*; *Stickney Decl.,* Ex. 7. Finally, EMS recommended both "a thorough environmental assessment of the entire facility to provide a more detailed understanding of the chemical contamination present…" and that "a structural engineer complete an assessment of the building to certify the structural integrity of the building." *Stickney Decl.,* Ex. 7. It was only upon receiving the EMS Report that Wattles



1   realized there might be more than environmental claims associated with the Building, and that

2   the Building's structure might be affected. *Wattles Decl.* at ¶ 12.  However, without the benefit

3   of any structural analysis of the Building at this time, Wattles did not know whether or not it

4   had suffered structural impairment. *Id.*

5   **C. After Wattles' Consultants Reported Potential Damage In 2011, Wattles**
      **Undertook Further Investigation and Testing To Confirm What Damage, If Any,**
6     **The Building Suffered During Exide's Tenancy.**

7       Based on EMS's recommendation, Wattles wrote Exide on March 1, 2011, demanding

8   Exide "promptly engage a structural engineer to assess the structural integrity of the Premises."

9   *Id. at* ¶13; *Stickney Decl.,* Ex. 9.   Subsequently, Wattles hired Farallon Consulting, LLC

10  ("Farallon") to provide a structural assessment of the roofing elements and concrete surfaces; an

11  industrial hygiene assessment of indoor air quality, material accumulation, and asbestos; and a

12  limited subsurface investigation of soil and groundwater quality.  *Wattles Decl.* at ¶ 13; Ex. A at

13  WATTLES004037-38.

14      As part of compiling its report, Farallon hired additional subconsultants to provide

15  analysis regarding specific technical issues.  *Id.,* Ex. A at WATTLES004037-38.  One such

16  consultant was Wiss, Janney, Elstner Associates, Inc. ("WJE"), which was to "evaluate the

17  current condition of the northern half of the warehouse roof to determine the extent and

18  magnitude of the observed distress conditions[.]" *Stickney Decl.,* Ex. 12 at CLG001713.

19  Another consultant Farallon retained was EMB Consulting LLC ("EMB"), which was to

20  conduct an industrial hygiene assessment of the indoor air quality and building materials for the

21  presence of hazardous substances.  *See Wattles Decl.*, Ex. A at WATTLES004037.

22

23

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 5

*USDC CASE NO. 3:14-CV-05097-RBL*



1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

Unlike the earlier limited review by EMS, WJE's review included taking samples of the wood roof framing, as well as analysis of the roof's structure. *See id.*, Ex. A at WATTLES004525-26. The Farallon report and its attachments were issued on February 19, 2013. *Id.,* Ex A. The attached WJE Report concluded that Exide's use of the Building affected and continued to affect the structural and non-structural elements of the Building. *Id.,* Ex A at WATTLES004524. Specifically relevant here, WJE concluded that the structural integrity of the Building had been reduced, and that repairs were required. *Id.*, Ex. A at WATTLES004536. The WJE Report attached to the February 19, 2013 Farallon Report was the first notice Wattles received, after diligent and costly investigation over a period of years, that the Building suffered structural impairment due to Exide's operations over the prior 30 years. *Wattles Decl.* at ¶ 14.

**D. Westchester Insured the Property From 1992 – 1995.**

Wattles paid premiums for three consecutive one year policies issued to Wattles by Westchester: Policy Nos.: JA 912-4039, effective November 1, 1992-1993; JA 913-2294, effective November 1, 1993-1994; and FPS 376793, effective November 1, 1994-1995 (collectively, the "Policies"). *Decl. of Brent J. Hardy in Opp. to Westchester Defs.' Mot. for Summ. J. Re: Suit Limitation ("Hardy Decl."),* Ex. A. Each of the Policies provides coverage for the Building for all risks not excluded in the policy that occur during the policy period. *Id.* In addition, the 1992 and 1993 policies include the following contractual suit limitation provision: "No suit or action on this policy for the recovery of any claim shall be sustainable … unless commenced within twelve months next after inception of the loss." *Id.* at Ex. A.1, WATTLES006477; Ex. A.2 WATTLES006514. Neither Wattles nor Westchester has located



1   the 1994 policy, and there is no evidence that the 1994 policy contained a suit limitation

2   provision, and if so, what its terms were. *See Stickney Decl.,* Ex. 16 at 1.

3   **E.   Westchester Wrongfully Denied Wattles' Claim, And Wattles Filed Suit.**

4          It was only upon receiving and digesting the Farallon Report in February 2013 that

5   Wattles realized the full nature and extent of the damage to the Building, which included both

6   environmental and property damage. *Wattles Decl.* at ¶ 13.  Wattles had not previously made

7   claims against its property insurers because many of the policies contained exclusions for

8   general contamination and industrial hygiene conditions.  *Id.*  However, upon realizing the

9   extent of the damage to the Building, including the structural issues, Wattles turned to its

10  property insurers.  *Id.*

11         Wattles provided its various insurance brokers with a Notice of Loss on September 27,

12  2013.  *Hardy Decl.* at ¶ 7, Ex. C.  When Wattles did not receive confirmation that Westchester

13  received the Notice of Loss, Wattles directly tendered its Notice of Loss to Westchester on

14  October 17, 2013.  *Hardy Decl.* at ¶ 8, Ex. D.  On November 8, Wattles produced its first set of

15  documents to Westchester, which included the Farallon Report and attached WJE and EMB

16  Reports.  *Hardy Decl.* at ¶ 9, Ex. E.  The production also included correspondence regarding

17  property improvements and modifications, along with pleadings filed in *The Wattles Co. v.*

18  *Exide Technologies, Inc.  Id.*  Westchester's representative was also invited to and did attend an

19  inspection of the Building on November 13, 2013.  *Wattles Decl.* at ¶ 15.  Despite being

20  provided with all of this information, Westchester failed to make a coverage determination in

21  this matter, and Wattles was forced to file its Complaint (Dkt. #1) on January 31, 2014 to avoid

22  violating Westchester's suit limitation provision and obtain coverage under the Policies.

23

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 7

*USDC CASE NO. 3:14-CV-05097-RBL*

**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

### III. EVIDENCE RELIED UPON

This Opposition is based on the accompanying Declarations of Craig Wattles and Brent J. Hardy in Opposition to Westchester Defendants' Motion for Summary Judgment Re: Suit Limitation, and on the files and records herein.

### IV. ARGUMENT

A motion for summary judgment should be granted only if there is no genuine issue of material fact or if reasonable minds could reach only one conclusion from all of the evidence, viewed in a light most favorable to the non-moving party. Fed. R. Civ. P. 56; *Sony Computer Entm't Am., Inc. v. Am. Home Assur. Co.,* 532 F.3d 1007, 1011 (9th Cir. 2008).  Here, both issues of fact and law preclude summary judgment.

**A. Westchester Has The Burden Of Proving Its Policy Limitations And Exclusions.**

Westchester's motion is premised on the assumption that all three of its policies at issue in this litigation contain a suit limitation provision that expires one year "after inception of the loss."  If Westchester's motion does not contain this language, its entire motion fails.

To the extent Westchester seeks the benefit of a policy limitation, it has the burden of proving that limitation is in the policy.  *Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha*, 126 Wash. 2d 50, 882 P.2d 703 (1994) (burden of proving exclusions is on insurer). Despite numerous requests from Wattles, Westchester has been unable to locate copies of any of the policies it issued to Wattles.  *Decl. of B. Hardy In Opp. To Westchester Defs.' Mot. for Summ. J. Re: Suit Limitation* ("*Hardy Decl.*") at ¶ 5.  Although Westchester agrees that copies of certain policy forms Wattles previously produced constitute the policies, Wattles has not so agreed, and discovery is ongoing on this issue.  *Id.*



1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150 • Fax: 425.284.1147

For purposes of this motion only, Wattles assumes that the 1992 and 1993 policy forms Wattles previously produced, and which are attached to the Hardy Declaration as Exhibits A.1 and A.2 respectively, are the Westchester policies and that they do contain the suit limitation provision Westchester seeks the benefit of now.  As to the 1994 policy, neither Wattles nor Westchester has located any of its policy forms; only a policy binder evidencing coverage has been located and produced.  *Id*. at 4, Ex. A.3. Westchester has produced no evidence to support its assumption that the 1994 policy contains any suit limitation whatsoever, much less a suit limitation with the specific language Westchester relies on, and as to the 1994 policy, Westchester's motion must be denied.

**B. Washington Courts Interpreting An "Inception of the Loss" Suit Limitation Clause Would Hold The Discovery Rule Applies.**

Westchester relies solely on dicta in the Washington State Supreme Court case *Panorama Village Condominium Owner's Association v. Allstate Insurance Company,* 144 Wash. 2d 130, 26 P.3d 910 (2001),  to argue the discovery rule does not apply to Washington courts' interpretation of suit limitation clauses containing the phrase "inception of the loss."  To the contrary, Washington has not decided this issue.  Given the opportunity, Washington courts would follow the overwhelming modern trend and hold that the suit limitation clause in Westchester's policy is subject to the discovery rule, and summary judgment should be denied.

1. Panorama Village Held the Discovery Rule Does Not Apply in Cases Involving "After a Loss Occurs" Language; It Did Not Hold the Converse, That "Inception" Language Bars A Discovery Rule.

In *Panorama Village*, the Washington Supreme Court was asked to decide whether a property owner's insurance claim for collapse due to hidden decay was barred by the insurance policy's suit limitation provision.  *Id*.  The suit limitation at issue there was different than the



**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

one in our case; instead of providing a limitation period of one year "after inception of a loss," (called an "inception" limitation), the *Panorama Village* suit limitation period expired "within one year after a loss occurs" (a kind of "occurrence" limitation). *Id.* at 135. Had the Supreme Court held that the discovery rule did apply, then there would not have been coverage. *See Panorama Vill. Condo. Owner's Ass'n v. Allstate Ins. Co.,* 99 Wash. App. 271, 992 P.2d 1047 (2000). Therefore, the Washington Supreme Court, which has a long history of interpreting insurance contracts in favor of coverage, examined the specific policy language, as that language specifically applied to a claim for hidden decay, and refused to apply the discovery rule, thereby finding coverage for the insured. *Panorama Village,* 144 Wash. 2d at 133-34.

To reach this conclusion, the *Panorama Village* Court distinguished between "occurrence" suit limitations (like the one at issue in that case) and "inception" suit limitations (like the provision at issue in this motion). In pointing out these differences, the Court's purpose was to show why "occurrence" limitation periods do not begin to run upon discovery; the Court did not hold that the discovery rule either does or does not apply to "inception" limitation periods. This distinction was important to find coverage in *Panorama Village* because there is persuasive authority outside Washington that "inception" limitation periods are subject to the discovery rule; so to avoid the discovery rule and preserve the insured's right to coverage, the Court had to distinguish "inception" limitation provisions from "occurrence" limitation provisions for purposes of cases involving hidden decay.

To avoid applying a discovery rule, the *Panorama Village* Court's main obstacle was the California case *Magnolia Square Homeowners Association v. Safeco Ins. Co.,* 221 Cal. App. 3d 1049, 271 Ca. Rptr. 1 (1990). There, a condominium association (the "HOA") knew, as of July



1985, that its building suffered structural defects. *Id*. at 1058. The HOA sued its insurer, Safeco, in April 1987. *Id*. The Safeco policy contained a one-year "occurrence" suit limitation. *Id*. Under California law, "inception" clauses are treated the same as "occurrence" clauses, and California courts had already held that the discovery rule applied to "inception" clauses. *See id*. at 1064 n.3; *Panorama Village*, 144 Wash. 2d at 140. So, the California court held that the discovery rule applied to bar the insured's claim on an "occurrence" suit limitation clause.

To avoid following *Magnolia Square* and the discovery rule that would bar the claim, the Washington Court in *Panorama Village* had to distinguish *Magnolia Square*. The Washington Court did this by noting that Washington, unlike California, recognizes a distinction between "occurrence" suit limitation clauses, and "inception" clauses. *Panorama Village,* 144 Wash. 2d at 140. It is in this context that the Court issued its dicta regarding inception clauses. *Id.* at 139. The Court held the discovery rule does not apply to "occurrence" clauses, but left the door open as to "inception" clauses.

> 2. The Majority of Jurisdictions Apply The Discovery Rule To "Inception" Suit Limitation Periods.

The holding in *Magnolia Square* (and numerous other California cases cited therein) applies a discovery rule when interpreting "inception" suit limitation provisions. *Ward v. Allstate Ins. Co.,* 964 F. Supp. 307 (C.D. Cal. 1997); *Central Nat'l Ins. Co. v. Superior Court,* 2 Cal. App. 4th 926, 3 Cal. Rptr. 2d 622 (1992); *Prudential-LMI Comm. Ins. V. Superior Court*, 51 Cal. 3d 674 798 P.2d 1230 (1990); *Magnolia Square,* 221 Cal. App. 3d 1049; *Lawrence v. Western Mut. Ins. Co.*, 204 Cal. App. 3d 565, 251 Cal. Rptr. 219 (1988); *Abari v. State Farm Fire & Cas. Co.*, 205 Cal. App. 3d 530, 252 Cal. Rptr. 565 (1988); *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 195 Cal. Rptr.421 (1983). Although Washington distinguished *Magnolia*



1  *Square* in the "occurrence" context, there is nothing to suggest that Washington would not

2  follow this long line of authority in the "inception" context.  This is particularly true where the

3  effect of interpreting the "inception" language as Westchester proposes – expiring no later than

4  one year after the policy ends – severely limits coverage to the point it is effectively illusory in

5  the context of ongoing losses, as discussed in further detail later in this brief.

6        California is not the only jurisdiction that applies a discovery rule to "inception" suit

7  limitation provisions, and in fact the overwhelming majority of modern cases apply such a rule.

8  In *O'Reilly v. Allstate Ins. Co*, 474 N.W.2d 221 (Minn. 1991), the appellate court, in applying a

9  discovery rule, stated that in cases of progressive or latent loss, "courts have been reluctant to

10 interpret contractual limitation periods strictly." *Id*. at 224.  Similarly, in *Prete v. Royal Globe

11 Ins. Co.,* 533 F.Supp. 332 (N.D. W. Va. 1982), the District Court applied West Virginia law to

12 hold an insurance policy's suit limitation period "did not begin to run until Plaintiffs actually

13 learned or by exercise of reasonable diligence should have learned of the damage to their

14 insured property." *Id*. at 336.  These courts applied the discovery rule because it "protects

15 against potentially inequitable technical forfeitures of insurance coverage in progressive or

16 latent loss cases when the time between the inception of the damage and its patency exceeds the

17 applicable period."  *O'Reilly*, 474 N.W.2d at 223; *accord Olson Marine Supplies v. Fildelity-

18 *Phenix Fire Ins. Co.*, 94 F. Supp. 726 (S.D.N.Y. 1950) (applying a discovery rule under New

19 York law where policy required suit within one year of "happening" of loss).

20       The only cases refusing to apply a discovery rule to "inception" suit limitation

21 provisions are readily distinguishable, and for the most part, legally ancient.[2]  *Wilson v. Indiana*

---

[2] Oregon is the only jurisdiction that has refused to apply a discovery rule in the context of what was arguably a progressive and ongoing loss.  In *Moore*, the court attempted to glean the intent of the legislature in statutorily

**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

1  *Ins. Co.,* 150 Ill. App. 3d 669, 502 N.E.2d 69 (1986) (damage from burst pipe not subject to

2  discovery rule)[3]; *Gremillion v. Travelers Indem. Co.,*256 La. 974, 240 So. 2d 727 (1970)

3  (refusing to apply discovery rule where loss was a single fire, and not a progressive loss);

4  *Morgan Guar. Trust Go. v. Aetna Cas. & Sur. Co.,* 199 A.D.2d 72, 604 N.Y.S.2d 952 (App.

5  Div. 1993) (discovery rule does not apply where loss was a single flood, and not a progressive

6  loss)[4]; *Marshburn v. Associated Indem. Corp.,* 84 N.C. App. 365, 353 S.E.2d 123 (1987)

7  (discovery rule does not apply where loss was due to a single lightning strike); *Gen. State Auth.*

8  *v. Plane Ins. Co.*, 464 Pa. 346 A.2d 265 (1975) (refusing to apply discovery rule where loss was

9  a single fire, and not a progressive loss)[5]; *Borgen v. Econ. Preferred Ins. Co.,* 176 Wis. 2d 498,

10  500 N.W.2d 419 (Ct. App. 1993) (discovery rule does not apply where loss was due to a single

11  hail storm, and not a progressive loss).  The overwhelming modern trend, applicable in cases of

12  progressive and ongoing loss, is to apply a discovery rule to "inception" suit limitation

13  provisions in insurance polices.

---

16  including "after inception of the loss" language in insurance policies.  *Moore v. Mut. of Enumclaw,* 317 Or. 235, 855 P.2d 626 (1993).  The court reasoned that because the statute was not written with reference to accrual, like other Oregon statutes applying the discovery rule, the discovery rule would not apply.  *Id.*  This is distinguishable from the case at hand where the suit limitation provision was not statutorily prescribed.  Here, Westchester drafted the suit limitation provision; if it did not want a discovery rule to apply, it could have drafted that into the provision. *See Boeing v. Aetna Cas. & Sur. Co.,* 113 Wash. 2d 869, 887, 784 P.2d 507 (1990).  Additionally, the *Moore* court admits the intent regarding applying a discovery rule to the "inception of the loss" provision is not clear.  *Moore,* 317 Or. at 250.  Under Washington law, ambiguous policy provisions must be interpreted in favor of the insured. *Panorama Village,* 144 Wash. 2d at 141.

[3] Other and older cases interpreting Illinois law are similarly distinguishable.  *Sager Glove Corp. v. Aetna Ins. Co.,* 317 F.2d 439 (7th Cir. 1963) (applying Illinois law to numerous individual acts of vandalism, not an ongoing and progressive loss such as the loss at issue here).

[4] Other and older New York cases are similarly distinguishable.  *Thames Realty Corp. v. Mass. Fire & Marine Ins. Co.,* 184 N.Y.S.2d 170 (Sup. Ct. 1959) (discovery rule does not apply where loss was an explosion, not an ongoing and progressive loss); *Margulies v. Quaker City Fire & Marine Ins. Co.,* 276 A.D. 697, 97 N.Y.S.2d 100 (1950) (discovery rule does not apply where loss was due to a hurricane, not a progressive loss).;

[5] Other and older Pennsylvania cases are similarly distinguishable.  *Lardas v. Underwriters Ins. Co.,* 426 Pa. 47, 231 A.2d 740 (1967) (refusing to apply discovery rule where loss was a single fire, and not a progressive loss).



3.   A History of "Inception" Suit Limitation Periods in the Standard Fire Policy.

To understand why modern courts faced with a progressive and ongoing loss unanimously hold that an "inception" suit limitation is subject to the discovery rule, a brief history helps provide context.  In the early days of the insurance industry, the idea of broad property insurance did not exist.  Instead, early property insurance policies only insured against losses caused by fire.  *See Prudential-LMI Comm. Ins.*, 51 Cal. 3d at 682.  To protect insurers against insurance fraud, the Standard Fire Policy adopted in 1887 originally required that an action be commenced "within twelve months next after the fire." *Id.* at 683.  The Standard Fire Policy was eventually expanded to cover more than just fire, including theft, lightning, and other specified perils. *Id.* To accommodate this slightly broader coverage, the suit limitation clause was also changed from "after the fire" to "after inception of the loss." *Id.*

Around the 1940s, a new kind of insurance emerged.  Harold Weston, *A La Carte Coverage. Unbundling Causes of Losses and Coverage Grants to Allow Consumer-Insured Selection,* 11 Rutgers J.L. & Pub. Pol'y 38, 44 (2013).  Instead of insuring against specified perils such as fire and theft, insurers began to offer "all-risks" property insurance. *Id.* at 50. All-risks policies provided much broader coverage than prior specified perils policies, because they would insure against all risks of physical loss to the property, except as specifically excluded.  *Findlay v. United Pac. Ins.*, 129 Wash. 2d 368, 381 n.2, 917 P.2d 116 (1996).  In other words, instead of insuring against a very limited list of risks, all-risk policies turned the insurance model on its head and required the insurer to cover anything and everything, unless the risk was specifically excluded.

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 14

*USDC CASE NO. 3:14-CV-05097-RBL*



1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

As all-risks policies began to evolve, so did their suit limitation provisions. Recognizing that an "inception of the loss" provision may be vague and confusing in the all-risks context, numerous insurers modified their polices' suit limitation provisions, the most common requiring suit within a certain amount of time "after occurrence of the loss." However, some policies continued to use an "inception of the loss" suit limitation provision as a carryover from the earlier fire and specified peril policies.

With the expansion of coverage, Courts have recognized that failing to apply a discovery rule to "inception" suit limitations is inappropriate. "There has been a clear trend in this century to use the discovery rule to protect plaintiffs who are not themselves negligent in asserting claims, but who would be barred from bringing suit because they could not have discovered the injury until more than [the limitation period] after it had occurred." *Bowman v. Abramson,* 545 F.Supp. 227, 230 (E.D. Pa. 1982). For this reason, modern courts examining "inception" suit limitation clauses in the context of progressive and ongoing losses hold that the discovery rule applies, and Washington courts given the opportunity to squarely address the issue would follow suit.

   4.   The Discovery Rule Should Be Applied to Further the Public Policy of Protecting Insureds.

Yet another reason that Washington courts would no doubt adopt a discovery rule in cases of progressive and ongoing loss is because failing to apply the rule would effectively render coverage illusory for any loss that occurs over a period of time. It would also render coverage illusory for losses that are concealed within walls, foundations, roofs, and other inaccessible areas, and not reasonably discoverable until years later, despite the fact that the policies contain no specific exclusions for such losses, and the policies otherwise provide



coverage.  Refusing to apply a discovery rule effectively turns the suit limitation provision into a substantive exclusion for concealed progressive and ongoing losses, despite the fact that the insurers did not write such an exclusion into the policy.  *See Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash. 2d 869, 887, 784 P.2d 507 (1990) ("[t]he industry knows how to protect itself and it knows how to write exclusions and conditions").  Insurers cannot bootstrap policy provisions together in this way to exclude coverage for losses that are otherwise covered.

Whether the discovery rule is extended to the circumstances of a particular case is a judicial policy determination. *Panorama Village,* 99 Wash. App. at 279 n.3. "[A]lthough public policy supports the fair treatment of insurers, this concern is secondary to the protection of insured and innocent third parties."  *Schwindt v. Commonwealth Ins. Co.,* 140 Wash. 2d 348, 385, 997 P.2d 353 (2000).  To avoid penalizing unaware insureds and inequitable forfeitures of coverage, the discovery rule should apply to cases of ongoing and progressive loss containing "after inception of the loss" language, such as Wattles' claim for collapse due to hidden decay.

5.   Under the Discovery Rule, Westchester's One-Year Suit Limitation Period Began To Run In February 2013, When Wattles Received the Farallon Report.

Applying the discovery rule to the Westchester Policies, Wattles' claim is timely.  At a minimum, the date the damage to the Building was no longer hidden is an issue of fact precluding summary judgment.  *Hillhaven Props. Ltd. v. Sellen Constr. Co.,* 133 Wash. 2d 751, 759, 948 P.2d 796 (1997); *accord O'Reilly,* 474 N.W.2d at 224; *Prudential-LMI,* 51 Cal. 3d at 687.  Viewing the facts in the light most favorable to Wattles, Wattles did not know, and should not have known, of the damage giving rise to its claim against its property insurers prior to receipt of the Farallon Report in February 2013.  Because this is within one year of Wattles' January 2014 lawsuit, Westchester's suit limitation provision is satisfied.



*Hillhaven* illustrates Washington's liberal test for determining when an insured knew or should have known of an insured loss. *Accord Panorama Village*, 99 Wash. App. 271 280, 992 P.2d 1047 (2000) (overruled on other grounds) (adopting the *Hillhaven* test to determine when an insured discovered the loss for purposes of a property insurance policy's suit limitation analysis). In *Hillhaven*, the insured property suffered extensive damage due to leaking windows. The leaking was first noticed in 1987, and thought to be a new construction "punchlist" issue. However, the leaking continued in 1988, so the owner wrote a letter to the contractor notifying it of the issue. In 1989, the owner retained a contractor to perform an investigation of the leaks, and the contractor reported that the building's vapor barrier was improperly installed. In response, the owner notified its insurers of the loss. The owner made repairs in 1990, but the water intrusion became worse. Finally, in 1991, another consultant for the owner performed additional investigation and discovered the real issue causing the water intrusion. By that time, the damage was so bad that an entire wing of the building had to be reconstructed in order to repair it. *Hillhaven*, 133 Wash. 2d at 755.

The property insurers argued that the insured's claim was barred because the insured "knew or should have known" of the water seepage and damage prior to 1989.[6] The Washington Supreme Court disagreed, holding that the question of knowledge is not only an issue of fact, but also that a letter to an opposing party (the contractor) intended to request further investigation and illicit a response from that party does not necessarily mean that the insured "knew or should have known" of the insured loss. The facts are identical here: the insured in *Hillhaven* wrote to the opposing party to put them on notice of potential damage, and

---

[6] Although the court in *Hillhaven* was not specifically examining the discovery rule under a suit limitation provision, the question of when the insured "knew or should have known" is the same question that determines when a limitation period subject to the discovery rule beings to run. *Panorama* Village, 99 Wash. App. at 280.

**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150 • Fax: 425.284.1147

that letter did not demonstrate that the insured "knew or should have known" of the insured loss. Similarly, Wattles' 2011 letter to Exide demanding further investigation does not mean that Wattles discovered the damage at that time. To the contrary, Wattles first discovered the insured damage upon receiving the Farallon report in February 2013. Prior to that, there is no evidence that Wattles "should have known" earlier, where Wattles was diligently investigating the claim through its consultants.

6. Wattles Did Not "Know Or Should Have Known" Of The Insured Loss When It Received The EMS Report In January 2011.

Westchester proposes two dates for when the decay at the Building must have been revealed to Wattles: (1) January 28, 2011, the date the EMS Report was finalized; and (2) March 2011, when Wattles made a demand to Exide to "mitigate" Wattles' ongoing damage. As discussed above, Wattles' March 2011 letter to Exide was merely to notify Exide of a potential issue, similar to the demand letter in *Hillhaven*. The earlier potential date – January 2011, when EMS issued its initial report – also does not evidence that Wattles "knew or should have known" of its insured loss. In arguing that this date applies, Westchester fails to recognize that Wattles' structural claims under the policies are different from the industrial hygiene issues Wattles hired EMS to investigate. EMS's "limited review" merely "measured the pH of materials on the roofing beams and collected samples of material and scrapings from wood beams, metal plates, a burned column, and the acid mist scrubber duct;" it was not a complete investigation intended to reveal the full nature and extent of damage to the Building. Notably, EMS did not take core samples of the wood beams or cement at the Property. EMS could only determine from its investigation that "low pH levels found on the surfaces and duct systems at the site constitute a *potential* problem for the structural integrity of the building." (reports at 3,

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 18

*USDC CASE NO. 3:14-CV-05097-RBL*

Page 18 of 22

**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150 • Fax: 425.284.1147

*emphasis added*).   EMS's recommendation to retain "a structural engineer complete an assessment of the building to certify the structural integrity of the building" was the first time a potential, much less an actual, structural problem was raised.  This preliminary investigation did not provide Wattles with the requisite knowledge of the extensive damage to the Building necessary to trigger the suit limitation period. At minimum, genuine issues of material fact exist regarding this issue.

Under the discovery rule, Wattles' suit is timely, and Westchester's motion for summary judgment dismissal of Wattles' claims should be denied.

**C. Westchester's Motion Should Be Denied Regardless of Whether the Discovery Rule Applies to "After Inception of the Loss" Suit Limitation Clauses.**

Even if the discovery rule does not apply generally to "inception" suit limitation provisions, Wattles' claim is nevertheless proper under the particulars of this case.  If the Policies' "inception" suit limitation clauses truly mean that Wattles must have filed suit within one year of the beginning of this progressive and ongoing loss, then the Policies are ambiguous, internally contradictory, and provide only illusory coverage for any progressive loss.

First, an ambiguity arises where the Policies are internally contradictory.  On the one hand, Westchester purports to provide coverage for collapse due to "hidden decay."  *Hardy Decl.* Ex. __.  Where decay is hidden, an insured is extremely unlikely to know about it in order to make a claim.  Yet Westchester would have this court hold that Wattles was required to know about hidden decay with one year of the hidden decay's inception, despite the fact that the decay is hidden, in order to take advantage of the hidden decay coverage in Westchester's policy.[7]  At

---

[7]  *Panorama Village* held that a claim for loss caused by "hidden decay" accrues when the "hidden decay" was no longer "hidden," i.e., concealed from view.  *Panorama Village,* 144 Wash. 2d at 144-45.  An interpretation

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 19

*USDC CASE NO. 3:14-CV-05097-RBL*



**HEFFERNAN**
LAW GROUP PLLC

1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

1   best, the two provisions read together are ambiguous because it is unclear whether the suit

2   limitation continues to run, despite the fact that decay remains hidden. *Weyerhaeuser Co. v.*

3   *Aetna Cas. & Sur. Co.,*123 Wash. 2d 897, 874 P.2d 142 (1994) (a provision is ambiguous if it is

4   susceptible to at least two reasonable interpretations). Where a provision is ambiguous, "the

5   meaning and construction most favorable to the insured must be applied…" *Panorama Village*,

6   144 Wash. 2d at 141. Moreover, coverage grants – such as the grant of collapse coverage here –

7   should be interpreted broadly to provide coverage whenever possible. *Odessa v. Ins. Co. of*

8   *Am.,* 57 Wash. App. 893, 897, 791 P.2d 237 (1990). "It must not be forgotten that the purpose

9   of insurance is to insure, and that construction should be taken which will render the contract

10  operative, rather than inoperative…" *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wash. 2d

11  65, 68, 659 P.2d 509 (1983). Resolving the ambiguity in favor of Wattles, the suit limitation

12  must be read subject to a discovery rule.

13      Further analysis of the facts in this particular case shows that Westchester's literal

14  "inception" theory goes beyond ambiguity, and is in direct conflict with other policy provisions.

15  This is why: Exide installed the battery acid tank, and began battery charging operations, in

16  1984. *Wattles Decl.* at ¶_. Although Wattles' expert analysis is not yet complete, Wattles'

17  expert will testify that the structural decay began at least within the first few years of the tank's

18  installation.[8] This means that the progressive and ongoing loss Wattles now seeks coverage for

19  "incepted" prior to any Westchester policy being issued. Therefore, by the time Westchester

20  otherwise, i.e. that a claim for loss caused by hidden decay instead accrues upon inception, is contrary to *Panorama Village's* holding and the policy's grant of coverage for hidden decay.

21  [8] Admittedly, information provided to Mr. Wattles and Wattles' attorneys by an expert is inadmissible hearsay. However, expert reports in this case are not due until June 10, 2015. Although Wattles is working to produce its decay timing report well ahead of this deadline, to the extent the court requires competent evidence on this specific

22  issue to decide this motion, Wattles hereby requests a continuance under FRCP 56(f) to complete its expert analysis determination of when the decay likely commenced so that such competent testimony, rather than the expert's

23  estimate, may be provided.



1   did issue a policy providing coverage for this loss, its suit limitation <u>already barred coverage</u>.

2   This renders the Policies' hidden decay coverage completely illusory, along with coverage for

3   any other potential progressive and ongoing loss.   Had Westchester wanted to exclude all

4   coverage for progressive and ongoing losses, then it could have expressly written such an

5   exclusion into its Policies; it did not.   Had Westchester wanted to exclude coverage for

6   progressive and ongoing losses "incepting" prior to its policy period, it could have done so;

7   again, it did not.   *Boeing,* 113 Wash. 2d at 887.   Instead, Westchester relies on a generic

8   "inception" suit limitation to argue that the policy, as applied to the facts of this case, contains

9   an exclusion for all progressive and ongoing losses "incepting" prior to and even during

10   Westchester's policy period. This result is not only unjust but also makes no sense, and the

11   "inception of the loss" suit limitation cannot be interpreted to support such a result.

## V.  CONCLUSION

13       Westchester is incorrect that the discovery rule does not apply to its "inception" suit

14   limitation provision. It is also incorrect in its factual analysis of Wattles' "discovery" of this

15   loss, where Wattles did not know of structural impairment to the Building until receiving the

16   February 2013 Farallon Report, with attached structural analysis from WJE.

17       Finally, even if Westchester's "inception" suit limitation weren't subject to a discovery

18   rule, the clause itself is ambiguous, renders the Policies internally contradictory, and affords

19   only illusory coverage for hidden decay and other progressive and ongoing losses.

20       Westchester's motion for summary judgment on the basis that Wattles' suit did not

21   comply with the "inception" suit limitation provision should be denied.

22       DATED this 8th day of September, 2014.

WATTLES' OPPOSITION TO WESTCHESTER
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT RE: SUIT LIMITATION - 21

*USDC CASE NO. 3:14-CV-05097-RBL*



1201 Market Street
Kirkland, Washington 98033-5440
Phone: 425.284.1150  • Fax: 425.284.1147

1

By: s/Devon M. Thurtle Anderson
    Devon M. Thurtle Anderson        WSBA #36795

2

    Heffernan Law Group PLLC
    1201 Market Street

3

    Kirkland, WA 98033
    Telephone: 425.284.1150

4

    Fax: 425.284.1147
    Email: devon@heffernanlawgroup.com

5

    Attorneys for Plaintiff The Wattles Company

6

By: s/Brent J. Hardy
    Brent J. Hardy        WSBA #45405

7

    Heffernan Law Group PLLC
    1201 Market Street

8

    Kirkland WA 98033
    Telephone: 425.284.1150

9

    Fax: 425.284.1147
    Email: brent@heffernanlawgroup.com

10

    Attorneys for Plaintiff The Wattles Company

11

12

13

14

15

16

17

18

19

20

21

22

23

