THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THE WATTLES COMPANY, a Washington corporation,

               Plaintiff,

     v.

SCOTTSDALE INSURANCE COMPANY, et al.,

              Defendants.

No.: 3:14-cv-05097-RBL

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS

**Note on Motion Calendar**

**October 3, 2014**

## I. RELIEF REQUESTED

Defendant Admiral Insurance Company respectfully moves the Court to dismiss the Wattles Company's breach of contract claims against Admiral. This motion does not address Wattles' extra-contractual claims against Admiral—that is, the motion does not address Wattles' allegations that Admiral violated the Washington Consumer Protection Act ("CPA") and acted in bad faith.

## II. INTRODUCTION

Wattles owns a warehouse that Admiral insured approximately 13-14 years ago for a two-year period. A commercial tenant leased this warehouse from Wattles for almost 30 years

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 1

Bullivant|Houser|Bailey PC

1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

and used the building to manufacture batteries. These battery-manufacturing operations caused the release of chemicals, primarily sulfuric acid, which, in turn, caused significant damage to the Warehouse. Years after observing this damage, Wattles tendered a claim to Admiral for coverage under two first-party property insurance policies—the 2000 Policy[1] and the 2001 Policy[2] (together, the "Policies").[3] Before Admiral could complete its investigation, Wattles sued Admiral, bringing breach of contract and extra-contractual claims.

As a matter of law, Wattles' breach of contract claims should fail. Years before this lawsuit, Wattles knew of and expected the damage caused by its tenant's operations.[4] The Policies exclude coverage for damage caused by the discharge of pollutants (including acid and chemicals), wear and tear, rust, corrosion, decay and deterioration, vapor or gas from industrial operations, and inadequate maintenance. Based on the reports of Wattles' own experts, these policy exclusions bar coverage for Wattles' insurance claim. [5]

The Policies provide separate coverage for "collapse" caused by hidden decay. But this loss does not involve **hidden** decay.[6] The structural elements of the building were visible at all times and Wattles' experts observed the structural damage more than two years before Wattles filed this lawsuit. In addition, the Policies cover only collapse that commences during the

---

[1] The 2000 Policy provided coverage from November 1, 2000, to November 1, 2001.

[2] The 2001 Policy provided coverage from November 1, 2001, to November 1, 2002.

[3] Declaration of Daniel R. Bentson in Support of Defendant Admiral Insurance Company's Motion for Partial Summary Judgment Regarding Plaintiff's Breach of Contract Claim ("Bentson Decl.") at pp. 4-40 (Admiral Policy No. S00AP08184 (the "2000 Policy")) and 41-77(Admiral Policy No. S01AP10006 (the "2001 Policy")).

[4] Because Wattles knowingly allowed the Warehouse to deteriorate, the loss is most likely not fortuitous and, thus, does not fall within the Policies' insuring agreements. Admiral reserves the right to raise this fortuity issue at a later date.

[5] Admiral accepts the reports of Wattles' own experts as true and accurate for purposes of this motion only.

[6] For purposes of this motion only, Admiral will accept that the deterioration to the wooden framing elements of the building falls within the meaning of "decay."

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 2

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1   Policies' effective periods.  Because the Warehouse did not collapse during the policy periods,

2   the Policies do not provide coverage.  Finally, because Wattles waited more than a decade to sue

3   Admiral, the Policies' suit-limitation provisions bar Wattles' contractual claims.  The Court,

4   therefore, should dismiss Wattles' breach of contract claims against Admiral, with prejudice.

### III.  FACTS

**A.   Exide's battery-manufacturing operations damaged the Warehouse.**

In 1980, Wattles purchased a large single-story warehouse in Sumner, Washington (the "Warehouse").[7]  The Warehouse covers approximately 86,400 square feet, with concrete floors, concrete or masonry walls, and a wooden frame roof structure.[8]

Shortly after purchasing the Warehouse, Wattles began leasing it to a battery manufacturer, Exide Technologies.[9]  Exide assembled, filled, and charged lead-acid batteries in the Warehouse.[10]  Corrosive chemicals, including sulfuric acid, were used in the facility during the years of battery manufacturing.[11]

Sulfuric acid is the primary acid used in the manufacturing of lead-acid batteries and Exide used sulfuric acid and water to fill battery casings prior to charging.[12]  After such use, the sulfuric acid broke down into other sulfur compounds, including sulfur dioxide.[13]  In addition, Exide's battery-manufacturing operations caused the release of inorganic lead in dust and

---

[7] Bentson Decl. at p. 86 (Farallon Report).

[8] *Id.* at p. 102 (EMB Report).

[9] *Id.* at p. 86 (Farallon Report).  Exide is a successor entity of the battery manufacturer to whom Wattles originally leased the Warehouse.  *See id.* at pp. 129-30; 132 (EUO of Craig B. Wattles).

[10] *Id.* at p. 86 (Farallon Report).

[11] *Id.* at p. 140 (WJE Report).

[12] *Id.* at p. 111 (EMB Report).

[13] *Id.*

---

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 3

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1    fume.[14]  Lead particles became airborne by attaching to acid and water mists during the battery-

2    manufacturing process.[15]  To control these acid mists, Exide installed a ventilation system and an

3    acid-mist scrubber.[16]

4         Despite this ventilation system and acid-mist scrubber, Exide's operations released acid

5    mist in the Warehouse.  The acid mist dispersed sulfuric acid throughout the air, and spread

6    acidic corrosives throughout the building.[17]  Because Exide failed to properly install the acid-

7    mist scrubber in a manner that would effectively reduce acid mist, these acid mists extended up

8    to the Warehouse's roof.[18]

9         The sulfuric acid used in Exide's battery-manufacturing operations significantly damaged

10   the Warehouse, causing severe distress to the wood-roof framing and concrete surfaces.[19]  This

11   visible damage included extreme staining and pitting of the floor and walls and caused all of the

12   horizontal truss surfaces to appear burned and charred.[20]

13        Admiral insured the Warehouse from November 1, 2000, to November 1, 2002, under

14   two separate policies.[21]  But, before Wattles purchased the Policies, Wattles knew of (and

15   expected) the damage caused by Exide's operations at the Warehouse.[22]  When Exide renewed

16   its lease with Wattles in 1999, for example, a lease addendum acknowledged the "extraordinary

17

-------------------------------------------------

18   [14] *Id.* at p. 110.

19   [15] *Id.*

20   [16] *Id.* at p. 109.

21   [17] *Id.* at p. 124.

22   [18] *Id.* at p. 89 (Farallon Report).

23   [19] *Id.* at p. 148 (WJE Report).

24   [20] *Id.* at p. 211 (EMS Report).

25   [21] *Id.* at p. 4 (2000 Policy) and p. 41 (2001 Policy).

26   [22] *Id.* at pp. 133-34 (EUO of Craig B. Wattles).

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR          Page 4
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1   wear and tear" caused by Exide's operations.[23]  And, prior to entering into the 1999 lease,

2   Wattles was aware of "known structural issues and the presence of hazardous substances" at the

3   Warehouse.[24]  Notwithstanding its knowledge of the "constant degrading" caused by Exide's

4   operations, Wattles continued to lease the Warehouse to Exide.[25]  Finally, in 2009, after

5   approximately 30 years, Exide stopped manufacturing batteries at the Warehouse.[26]

6   **B.      Wattles and its consultants observed the damage to the Warehouse.**

7           In later 2010 to early 2011, Wattles observed a significant truss break and concrete

8   staining at the Warehouse.[27]  Wattles then hired Environmental Management Services ("EMS")

9   to assess any damage to the Warehouse caused by Exide's battery-manufacturing operations.[28]

10  In its January 2011 report, EMS noted "visual observations" of "extreme staining and pitting of

11  the cement floor and walls of the building."[29]  "[F]loor staining and pitting was spread

12  throughout the structure and appeared at regular intervals under the truss joints."[30]  In addition,

13  EMS noted the "burned/charred appearance" of "all of the horizontal truss surfaces" and

14  observed that the most severely charred trusses had "a curled and peeled surface."[31]  According

15  to EMS, the "majority of the beams had a blackened surface which was sticky to the touch" and

16

17  _____

18  [23] *Id.* at p. 214 (1999 Lease Addendum).

    [24] *Id.* at p. 216 (Letter from Cascadia Law Group to Exide, dated March 1, 2011).

19
    [25] *See id.* at p. 134 (EUO of Craig B. Wattles).

20
    [26] *Id.* at p. 218 (Letter from Exide Technologies to the Puget Sound Clean Air Agency ("PSCAA"),

21  dated October 16, 2009).

22  [27] *Id.* at p. 131 (EUO of Craig B. Wattles).

23  [28] *Id.* at p. 210 (EMS Report).

24  [29] *Id.* at p. 211.

25  [30] *Id.*

26  [31] *Id.*

1     "[a]ll of the metal truss plates and rivets exhibited extreme corrosion[.]"[32]

2         EMS also observed and tested the acidity levels of the overhead beams and the metal

3 surfaces of the truss structures.[33]  EMS informed Wattles that the acidity levels posed a potential

4 problem for the structural integrity of the building.[34]  A site visit in August 2011, performed by

5 Wattles' engineering consultant, Wiss, Janney, Elstner & Associates ("WJE"), confirmed the

6 observable corrosion and distressed wood framing at the Warehouse.[35]

7         Armed with the information from EMS's inspection, Wattles sent three demand letters to

8 Exide, along with a draft complaint, threatening to sue Exide for the damage it caused to the

9 Warehouse.[36]  In the demand letters, Wattles' stated that Exide's failure to properly maintain the

10 Warehouse constituted a breach of the lease agreement.[37]  Wattles further alleged that Exide's

11 activities had compromised the "structural integrity" of the Warehouse.[38]

12         After sending its demand letters to Exide, Wattles hired additional engineering and

13 environmental consultants to inspect the Warehouse for damage.  Wattles' engineering

14 consultant, WJE, concluded that Exide's activities had "caused deterioration of building

15 elements[,]"[39] including "corrosion,"[40] "degradation,"[41] "erosion,"[42] "charring,"[43] "fractured

---

[32] *Id.*

[33] *Id.* at p. 212.

[34] *Id.*

[35] *Id.* at p. 233 (Letter from WJE to Farallon, dated August 24, 2011).

[36] *Id.* at p. 216 (Letter from Cascadia Law Group to Exide, dated March 1, 2011); p. 219 (Letter from Cascadia Law Group to Exide, dated April 8, 2011); p. 221 (Letter from Cascadia Law Group to Exide, dated April 25, 2011).

[37] *See id.* at p. 216 (Letter from Cascadia Law Group to Exide, dated March 1, 2011).

[38] *Id.* at p. 227 (Letter from Cascadia Law Group to Exide, dated April 25, 2011).

[39] *Id.* at p. 140 (WJE Report).

[40] *Id.* at p. 139.

[41] *Id.*

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1   wood framing," and "deteriorated concrete."[44]  Likewise Wattles' additional industrial hygiene

2   and environmental consultants, EMB Consulting and Farallon Consulting identified "corrosion

3   and deterioration of building materials"[45] and observed "severe . . . distress to building

4   elements."[46]

5   **C.**    <u>**Wattles sued Exide for damaging the Warehouse.**</u>

6        On March 28, 2013, Wattles sued Exide in Pierce County Superior Court.[47]  In its

7   complaint, Wattles alleges that Exide's battery-manufacturing operations damaged the

8   Warehouse:

9              Exide failed to keep the Property in good order, condition, and
               repair insofar as Exide's operations resulted in significant damage
10           to the floor, walls, ceiling, beams, pipes, and other structural
               elements of the Property.[48]

11   After Wattles sued Exide, however, Exide filed for bankruptcy.[49]

12   **D.**    <u>**After Exide filed for bankruptcy, Wattles tried to collect from its first-party**</u>
13        <u>**property insurers.**</u>

14        When Exide filed for bankruptcy, Wattles turned to its first-party property insurers to

15   recover for the Warehouse damage.  On October 7, 2013, Admiral received a letter from Wattles,

16   requesting coverage under the Policies.[50]  Then, on February 4, 2014, before Admiral had

---

18   [42] *Id.* at p. 144.

19   [43] *Id.* at p. 148.

20   [44] *Id.* at p. 140.

21   [45] *Id.* at p. 108 (EMB Report).

22   [46] *Id.* at p. 82 (Farallon Report).

23   [47] *Id.* at pp. 236-49 (Wattles' Complaint Against Exide).

24   [48] *Id.* at p. 241.

25   [49] *Id.* at p. 251 (Wattles Motion for Relief from Automatic Stay).

26   [50] *Id.* at pp. 265-72 (Property Loss Notice from Propel Insurance, dated October 7, 2013).

---

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 7

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

completed its investigation or rendered a coverage decision, Wattles filed the present lawsuit against Admiral and the other defendant insurers.[51]  In the Complaint, Wattles alleges that Admiral breached the Policies by failing to pay for the damage to the Warehouse.[52]  Wattles also brought extra-contractual claims, alleging that Admiral acted in bad faith and violated the CPA.[53]

## IV.  ARGUMENT AND AUTHORITY

Wattles' breach of contract claims hinge on whether the Policies provide coverage for the damage to the Warehouse.  A federal court sitting in diversity applies the law of the place in which it sits[54] and, thus, Washington law applies to this dispute.  Under Washington law, determining whether coverage exists is a two-step process.[55]  The insured bears the burden of proving damage that falls within the policy's insuring agreement.[56]  And, even if the insured successfully shows that the loss falls under the insuring agreement, the loss is not covered if the insurer proves that a policy exclusion applies.[57]

**A.**   **The Policies exclude coverage for damage caused by Exide's battery-manufacturing operations.**

The Policies insuring agreements cover only direct physical damage to covered property caused by a covered cause of loss that commences during the policy's effective period.  But even if Wattles could meet its initial burden to trigger either of the Policies, the Policies contain several exclusions that bar coverage for Wattles' insurance claim.

**1.**    **The Policies exclude coverage for damage caused by the discharge of acid**

---

[51] Dkt No. 1.

[52] *Id.*

[53] *Id.*

[54] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

[55] *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000 (1992); *Overton v. Consolidated Ins. Co.*, 145 Wn.2d 417, 431, 38 P.3d 322 (2002).

[56] *McDonald*, 119 Wn.2d at 731.

[57] *Id.*

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

**and chemicals.**

The Policies do not cover damage caused by the discharge of "pollutants":

> We will not pay for loss or damage caused by or resulting from any of the following:
>
> * * *
>
> Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

The Policies define the term "pollutants" to include both "acids" and "chemicals":

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

And the Policies also define the phrase "specified causes of loss":

> "Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice of sleet; water damage

Under these provisions, then, acid and chemical damage are not covered unless (1) a "specified cause of loss" causes the acid and chemical damage or (2) the acid and chemical damage results in a "specified cause of loss," in which case, the damage caused by the "specified cause of loss" is covered.

Washington courts interpret insurance policies as contracts.[58] Policies should be construed as a whole and given a fair, reasonable, and sensible construction, as would be given to the contract by the average person purchasing insurance.[59] Applying an ordinary

---

[58] *Am. States Ins. Co. v. Delean's Tile & Marble, LLC*, 179 Wn. App. 27, 35, 319 P.3d 38 (2013).

[59] *Id.*

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 9

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

interpretation to the perils identified as "specified causes of loss," none of these specified perils (e.g., fire, lightning, explosion, vandalism, etc.) caused the escape of the damaging pollutants, nor did the pollutants in turn cause a specified cause of loss.  Rather acid and chemicals from Exide's normal operations damaged the Warehouse.  Because Exide's industrial operations are not a specified cause of loss, and the damage did not result in a specified cause of loss, the Policies do not provide coverage.

**2.   The Policies exclude coverage for damage caused by wear and tear and rust corrosion, decay, and deterioration.**

The Policies also exclude coverage for wear and tear and rust, corrosion, decay, and deterioration:

> We will not pay for loss or damage caused by or resulting from any of the following:
>
> \* \* \*
>
> **(1)**   Wear and tear;
>
> **(2)**   Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

To the extent any of these excluded perils damaged the Warehouse, then, the Policies do not provide coverage.

Wattles described the damage caused by Exide's operations as "wear and tear."[60]  And Wattles' own experts identify the Warehouse damage as "corrosion,"[61] "degradation,"[62] "erosion,"[63] and "deterioration."[64]  Thus, when describing the damage to the Warehouse, Wattles' own experts explicitly identify, or employ synonyms for, the same perils excluded

---

[60] Bentson Decl. at p. 214 (1999 Lease Addendum).

[61] *Id.* at p. 139 (WJE Report).

[62] *Id.*

[63] *Id.* at p. 144.

[64] *Id.* at p. 139.

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 10

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1 under the Policies.[65]  There is, then, no genuine dispute that the damage alleged by Wattles is the

2 *corrosion* and *deterioration* of building members, caused by acid and chemicals from Exide's

3 battery-manufacturing operations.  Because the Policies exclude coverage for this type of

4 damage, Wattles' insurance claim is not covered.

5       The wear and tear and rust, corrosion, decay and deterioration exclusions, however, are

6 subject to a resulting loss clause:

7           But if an excluded cause of loss that is listed in [exclusions
          (1) or (2)] results in a "specified cause of loss" or building
8           glass breakage, we will pay for the loss or damage caused
          by that "specified cause of loss" or building glass breakage.
9

Thus, under these provisions, if (1) wear and tear or (2) rust, corrosion, decay and deterioration

10 result in a specified cause of loss, the damage caused by the specified cause of loss is covered.

11 In this case, however, the excluded perils (i.e., wear and tear, and rust, corrosion, decay, and

12 deterioration) did not *result* in a specified cause of loss (e.g., fire, lightning, explosion,

13 vandalism, etc.) and, therefore, the Policies do not provide coverage.

14     **3.**      **The Policies exclude coverage for damage caused by vapor or gas from**
           **industrial operations.**
15

      The Policies do not cover damage caused by smoke, vapor, or gas from industrial

16

17 operations:

18           We will not pay for loss or damage caused by or resulting
          from any of the following:
19                             * * *

20           c.      Smoke, vapor or gas from agricultural smudging or
               industrial operations.
21

Thus, if the damage to Warehouse was caused by vapor or gas[66] from Exide's industrial

22 operations, the Policies do not provide coverage.

23

---

24 [65] *See Kish v. Ins. Co. of N. Am.*, 125 Wn.2d 164, 170, 883 P.2d 308 (1994) ("An insured may not
25 avoid a contractual exclusion merely by affixing an additional label or separate characterization to
the act or event causing the loss.").

26 [66] *See, e.g.,* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1304 (1991) (defining "vapor" as "a
substance in the gaseous state as distinguished from the liquid or solid state").

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR    Page 11
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1    Here, Wattles' own experts concluded that Exide failed to maintain or install acid-mist

2    scrubbers that would effectively reduce acid mists in the Warehouse.[67]  The release of these acid

3    mists causes the dispersal of sulfuric acid throughout the air and spread acidic corrosives

4    throughout the Warehouse.[68]  These acid mists spread up to the roof of the Warehouse,[69]

5    resulting in severe distress to the Warehouse's wood-roof-framing elements and concrete

6    surfaces.[70]  Because the Policies specifically exclude coverage for damage caused by vapor or

7    gas from industrial operations, there is no coverage for the damage to the Warehouse caused by

8    these acid mists.

9        **4.**      **The Policies exclude coverage for damage caused by inadequate maintenance.**

10

11    The Policies does not cover damage caused by inadequate maintenance:

12    > We will not pay for loss or damage caused by or resulting from [subpart c].  But if an excluded cause of loss that is listed in [subpart c] results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

13

14    >                \* \* \*

15    > c.      Faulty, inadequate or defective:

16    >                \* \* \*

17    > **(4)**    Maintenance;

18    > of part or all of any property on or off the described premises.

19    Under the Policies, then, if faulty, inadequate, or defective maintenance damaged the

20    Warehouse, the damage is not covered.

21        But, in Wattles' complaint against Exide, it explicitly argues that Exide's faulty,

22    ───────────────

23    [67] Bentson Decl. at p. 89 (Farallon Report).

24    [68] *Id.* at p. 124 (EMB Report).

25    [69] *Id.* at p. 89 (Farallon Report).

26    [70] *Id.* at p. 148 (WJE Report).

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 12

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

inadequate, and defective maintenance caused the damage to the Warehouse:

> ***Exide failed to keep the Property in good order, condition, and repair*** insofar as Exide's operations resulted in significant damage to the floor, walls, ceiling, beams, pipes, and other structural elements of the Property.[71]

And Wattles' experts acknowledge that Exide's failure to properly install the acid-mist scrubber, caused the acid-mists to damage the Warehouse.[72]  Because Exide's faulty maintenance caused the damage the Warehouse, the Policies exclude coverage.

Although the faulty-maintenance exclusion is subject to a "resulting-loss" (or, an "ensuing-loss") clause, the damage to the Warehouse remains uncovered.  The purpose of a resulting-loss "provision is to limit the scope of an exclusion from coverage; losses caused by the excluded peril will be covered unless they are subject to their own specific exclusions."[73]  As the Washington Supreme Court explained:

> The ensuing loss clause may be confusing, but it is not ambiguous. Reasonably interpreted, the ensuing loss clause says that if one of the specific uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered.  ***The uncovered event itself, however, is never covered.***[74]

An excluded loss must cause damage to some property ***other than itself***, before the resulting-loss provision applies.  In *Sprague v. Safeco Ins. Co. of Am.*,[75] for example, the insureds owned a home featuring a deck supported by fin walls.[76]  Due to poor construction, the fin walls began to decay to the point of "imminent collapse."[77]  Safeco denied the insureds'

---

[71] *Id.* at p. 241 (Wattles' Complaint against Exide) (emphasis added).

[72] *Id.* at p. 89 (Farallon Report).

[73] *Sprague v. Safeco Ins. Co. of Am.*, 174 Wn.2d 524, 529, 276 P.3d 1270 (2012).

[74] *McDonald*, 119 Wn.2d at 734 (emphasis added).

[75] 174 Wn.2d 524.

[76] *Id.* at 526.

[77] *Id.* at 527.

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS

Page 13

claim based on policy exclusions for faulty construction and rot—even though the exclusions contained ensuing loss clauses.[78]

The insureds' sued and, on appeal, argued that construction defect and rot (excluded perils) caused their deck to reach a state of "collapse" (a covered peril) and, thus, the "collapse" was an ensuing loss covered under the policy.[79] The Washington Supreme Court, however, rejected the insured's argument. The court held that the policy excluded coverage for the poorly constructed rotten fin walls.[80] According to the court, the resulting loss clause did not trigger coverage because the there was no loss or damage to other separate property; the only loss or damage was to the deck system itself and, therefore, the policy did not provide coverage.[81]

Here, Exide's inadequate maintenance did not result in damage to some other property at the Warehouse. The inadequate maintenance directly damaged the floor, walls, and structural elements supporting the Warehouse roof. Because the inadequate maintenance did not result in damage to other property (property other than the poorly maintained Warehouse itself), the resulting loss clause does not apply.[82]

**B.**   **The Policies do not provide "collapse" coverage for Wattles' insurance claim because the Warehouse did not collapse during the policy periods.**

The Policies generally exclude coverage for "collapse," but later provide an additional collapse coverage. The 2000 Policy provides additional coverage for collapse but leaves the

---

[78] *Id.*

[79] *Id.* at 529.

[80] *Id.* at 531.

[81] *Id.* at 530-31; *see also Allianz Ins. Co. v. Impero*, 654 F. Supp. 16, 18 (E.D. Wash. 1986).

[82] As discussed above, the Policies exclude coverage for damage caused by (1) the dispersal of acid and chemicals, (2) wear and tear, (3) rust, corrosion, decay, or deterioration, and (4) vapor or gas from industrial operations. Thus, even if Exide's inadequate maintenance resulted in acid and chemical damage to the Warehouse, such resulting damage would remain uncovered due to these other exclusions. *See Wright v. Safeco Ins. Co. of Am.*, 124 Wn. App. 263, 274-75, 109 P.3d 1 (2004); *see also Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wn.2d 501, 515, 276 P.3d 300 (2012).

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS

Page 14

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

term "collapse' undefined:

>The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited . . . below.

>1.   We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following

>>a.   The "specified cause of loss" or breakage of building glass, all only as insured against in this Coverage Part;

>>b.   Hidden decay;

Under the 2000 Policy, then, if hidden decay caused the Warehouse or a part of the Warehouse to "collapse," the damage is covered.

The 2001 Policy also provides additional coverage for "collapse":

>The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited . . . below.

>1.   With respect to buildings:

>>a.   Collapse means an abrupt falling down or caving in of a building or in any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

>>b.   A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

>>c.   A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

>>d.   A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

>2.   We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS

Page 15

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

following

a.    The "specified cause of loss" or breakage of building glass, all only as insured against in this Coverage Part;

b.    Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

Thus, under the 2001 Policy, if hidden decay, unknown to Wattles, caused the Warehouse or a part of the Warehouse to abruptly fall down, the damage is covered.

But the Policies cover only collapse that "commences" during the policy periods:

Under this Coverage Part:

1.    We will cover loss or damage commencing:

a.    During the policy period shown in the Declarations;

Thus, "collapse" that occurs *before* the Policies incepted or *after* they expired, is not covered.

## 1.    Damage "commences" if it occurs during the policy period.

The Washington Supreme Court addressed nearly identical policy language in *Ellis Court Apartments Ltd. P'ship v. State Farm Fire & Cas. Co.*[83]  In *Ellis Court*, State Farm insured Ellis Court's apartment building and the State Farm policies at issue provided coverage for collapse caused by hidden decay that commenced during the policy period.[84]  Due to water intrusion that occurred during the State Farm policies' effective periods, Ellis Court's apartments reached a state of "substantial structural impairment."[85]  But the damage did not manifest until after the State Farm policy's expired.[86]  State Farm denied the claim and Ellis Court brought a coverage action against State Farm.[87]

---

[83] 117 Wn. App. 807, 72 P.3d 1086 (2003).

[84] *Id.* at 810.

[85] *Id. Ellis Court* did not analyze whether the State Farm policy's "collapse" coverage applies to substantial structural impairment.

[86] *Id.*

[87] *Id.*

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS        Page 16

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1    On appeal, the Washington Court of Appeals addressed the appropriate "trigger" for

2  coverage—that is, the court addressed when the damage claimed by Ellis Court "commenced."

3  State Farm urged the court to adopt the "manifestation trigger," which "'fixes liability for first

4  party property losses solely on the insurer whose policy was in force at the time the progressive

5  damage became appreciable or 'manifest.'"[88]   Alternatively, Ellis Court argued that the court

6  should adopt an "injury-in-fact" trigger.[89]   It argued that the term "commence" meant "losses

7  that occur during the policy period."[90]   The Washington Court of Appeals agreed with Ellis

8  Court, holding that Ellis Court's interpretation of the term "commence" conformed to the State

9  Farm policy language[91]   Under *Ellis Court*, then, regardless of when Wattles discovered the

10  alleged collapse, the Policies cover only collapse that occurred during their effective periods.

11    The Washington Court of Appeals reached a similar conclusion in *Mercer Place Condo.*

12  *Ass'n v. State Farm Fire & Cas. Co.*[92]   In *Mercer Place*, State Farm insured Mercer Places'

13  condos and the State Farm policy provided coverage for collapse caused by hidden decay that

14  commenced during the policy's effective period.[93]   Mercer Place made a claim for structural

15  damage caused by rot in the condos' wood framing and State Farm agreed to pay only for the

16  repair of portions of the building that were already in a state of substantial structural

17  impairment.[94]   State Farm then canceled its policy with Mercer Place and Mercer Place sued

18

19  _____

20  [88] *Id.* at 812 (quoting *Prudential-LMI Ins. v. Superior Court*, 51 Cal.3d 674, 694, 274 Cal. Rptr. 387, 798 P.2d 1230 (1990)).

21  [89] *Id.* at 813.

22  [90] *Id.* at 815.

23  [91] *Id.* at 816.

24  [92] 104 Wn. App. 597, 17 P.3d 626 (2001).

25  [93] *Id.* at 599-600.

26  [94] *Id.* at 600.

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 17

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1  State Farm.[95]

2  On appeal, Mercer Place argued that its progressive loss began during the State Farm

3  policy period.  According to Mercer Place, because the policy provided coverage for losses that

4  "commenced" during the policy period, the policy applied to building components that had not

5  yet reached a state of "collapse" but would eventually reach such a state due to the progressive

6  nature of the loss.[96]  The Washington Court of Appeals rejected this argument.[97]  According to

7  the court, "collapse cannot commence before it occurs."[98]  The court concluded, therefore, that

8  the policy "provides coverage for collapse . . . *during the policy period*, and does not extend to

9  damage that will, unless the underlying condition causing progressive structural decay is

10  corrected, eventually reach a point of collapse outside of the policy period."[99]  In short, where a

11  first-party property policy limits coverage to damage that commences during the policy period,

12  Washington courts require the insured to prove the collapse occurred while the Policies were in

13  effect.

14  **2.      The Warehouse did not collapse during the policy periods.**

15  The 2001 Policy defines "collapse" as an abrupt falling down.  There is no evidence that

16  the Warehouse or any part of the Warehouse abruptly fell down between November 1, 2001, and

17  November 1, 2002.  To this day, the Warehouse remains standing and the truss break that

18  triggered Wattles' first environmental assessment occurred, in late 2010 or early 2011,

19  approximately eight to nine years after the 2001 Policy expired.[100]  The 2001 Policy, therefore,

---

[95] *Id.*

[96] *Id.* at 603-04.  Both parties stipulated that State Farm's policy covered substantial structural impairment and so *Mercer Place* did not analyze whether the State Farm policy's "collapse" coverage applies to substantial structural impairment.  *See id.* at 602.

[97] *Id.* at 604.

[98] *Id.*

[99] *Id.* at 606 (emphasis added).

[100] Bentson Decl. at p. 131 (EUO of Craig B. Wattles).

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR       Page 18       **Bullivant|Houser|Bailey PC**
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S                              1700 Seventh Avenue, Suite 1810
BREACH OF CONTRACT CLAIMS                                                   Seattle, Washington 98101-1397
                                                                           Telephone: 206.292.8930

1   does not provide collapse coverage for the Warehouse.

2         The 2000 Policy does not define the term "collapse." Washington courts have not

3   defined "collapse," when the term appears undefined in an insurance policy.[101] Courts across the

4   country debate whether the term "collapse" includes coverage for "imminent collapse" or

5   whether the term describes a building that has actually fallen to the ground.[102] Although some

6   federal courts previously held that the Washington Supreme Court would adopt the "imminent

7   collapse" standard,[103] the Washington Supreme Court's decision in *Sprague* calls this conclusion

8   into question.[104] And, even if Washington courts were to adopt the "imminent collapse"

9   standard, the insured must present evidence of an imminent collapse—***not*** just a substantial

10  impairment of structural integrity.[105] To require a showing of substantial structural impairment

11  only would "inappropriately convert the insurance policy into a 'maintenance agreement,'

12  allowing recovery for damage that is significant but does not threaten collapse."[106]

13        Here, the 2000 Policy covered only damage commencing between November 1, 2000,

14  and November 1, 2001. There is no evidence that the Warehouse, nor any part of the

15  Warehouse, actually fell down during this period. Moreover, there is no evidence that the

16  Warehouse, nor any part of the Warehouse, was in imminent danger of falling down during this

---

17  [101] *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 2012 WL 5456685 at *3
18  (W.D. Wash. 2012); *see also Sprague*, 174 Wn.2d at 529.

19  [102] *Queen Anne Park*, 2012 WL 5456685 at *3.

20  [103] *See Assurance Co. of Am. v. Wall & Assocs., LLC*, 379 F.3d 557, 563 (9th Cir. 2004); *see also
    Dally Props., LLC v. Truck Ins. Exch.*, 2006 WL 1041985 (W.D. Wash. 2006); *Allstate Ins. Co. v.*
21  *Forest Lynn Homeowners Ass'n*, 892 F. Supp. 1310 (W.D. Wash. 1996), *withdrawn from
    publication*, 914 F. Supp. 408 (W.D. Wash. 1996).
22
    [104] *Queen Anne Park*, 2012 WL 5456685 at *3 (citing *Sprague*, 174 Wn.2d at 538 (Alexander, J.,
23  concurring)).

24  [105] *Id*. at 4; *Siena Del Lago Condo. Ass'n v. Am. Fire & Cas. Co.*, 2013 WL 2127137 at *2 n. 4
    (W.D. Wash. 2013).
25
    [106] *Queen Anne Park*, 2012 WL 5456685 at *4 (quoting *Ocean Winds Council of Co-Owners, Inc. v.*
26  *Auto-Owner Ins. Co.*, 350 S.C. 268, 270-71, 565 S.E.2d 306 (2002)).

---

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR          Page 19          **Bullivant|Houser|Bailey PC**
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S                              1700 Seventh Avenue, Suite 1810
BREACH OF CONTRACT CLAIMS                                                  Seattle, Washington 98101-1397
                                                                           Telephone: 206.292.8930

period. Because the Warehouse remains standing today—almost *13 years* after the 2000 Policy

expired—no reasonable juror could conclude that the Warehouse was in *imminent* danger of

collapsing during the 2000 Policy's effective period. Finally, even if the Court required a mere

showing of a substantial structural impairment, there is no evidence that any condition of

substantial impairment commenced within the Policies' effective periods.[107] For these reasons,

regardless of how the Court construes the term "collapse," the Policies do not provide coverage.

**C.** **The Policies' suit-limitation provisions bar Wattles' breach of contract claim.**

 The Policies each contain suit-limitation provisions, which prohibit the insured from

suing Admiral more than two years after date the physical damage to the property occurs:

> No one may bring a legal action against us under this
> Coverage Part unless:
>
>     * * *
>
> 2. The action is brought within 2 years after the date on
>   which the direct physical loss or damage occurred.

Washington courts routinely enforce contractual suit-limitation provisions and, thus, if Wattles

sued Admiral after the two-year suit-limitation periods expired, Wattles' breach of contract claim

is time barred.[108]

 **1.** **The suit-limitation periods expired approximately 10 years ago.**

 As discussed above, the Policies cover only damage commencing during the policy

periods and, thus, any loss or damage that commenced *before* November 1, 2000, or *after*

November 1, 2002, is *not* covered.[109] Because the event triggering the suit-limitation periods

---

[107] Wattles may attempt to "back date" the alleged "decay" in structural materials to argue that the Warehouse reached a state of substantial structural impairment during the policy periods. The Washington Court of Appeals, however, has rejected similar attempts to back date decay. *See Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 176 Wn. App. 168, 181-82, 313 P.3d 408 (2013).

[108] *See, e.g.*, *Wothers v. Farmers Ins. Co. of Wash.*, 101 Wn. App. 75, 79, 5 P.3d 719 (2000); *Graingrowers Warehouse Co. v. Cent. Nat'l Ins. Co. of Omaha*, 711 F. Supp. 1040, 1045 (E.D. Wash. 1989).

[109] *See Mercer Place*, 104 Wn. App. at 606; *see also Ellis Court*, 104 Wn. App. at 816.

---

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 20

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1 must have occurred no later than November 1, 2002, the two-year suit-limitation periods began

2 running during that time period as well. And because the suit-limitation periods began running

3 no later than November 1, 2002, they expired no later than November 1, 2004. Wattles filed its

4 lawsuit against Admiral, however, on February 4, 2014; that is, Wattles sued Admiral almost *10*

5 *years* after both suit-limitation periods expired. Because the Policies prohibit such lawsuits, the

6 Court should dismiss Wattles' breach of contract claims.

7     **2.**    **The acid and chemical decay was not hidden from Wattles.**

8     In *Panorama Village Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.*,[110] Allstate

9 insured Panorama's condominiums, which, due to years of hidden decay, were in danger of

10 collapsing.[111] Allstate's policy covered collapse caused by hidden decay and contained a one-

11 year suit limitation provision.[112] When Allstate did not pay Panorama's insurance claim,

12 Panorama sued Allstate and Allstate moved to dismiss the breach of contract claim on grounds

13 that the Allstate policy's suit-limitation period had expired.[113] The Washington Court of Appeals

14 held that the policy's suit-limitation period began to run from the time Panorama knew, or

15 reasonably should have known, that the loss was occurring.[114] The court of appeals then

16 remanded the case for additional findings of fact.[115]

17     But the Washington Supreme Court reversed the court of appeals.[116] According to the

18 court, under Allstate's policy, the peril insured against continued until (1) actual collapse or (2)

19

20 [110] 144 Wn.2d 130, 26 P.3d 910 (2001).

21 [111] *Id.* at 134.

22 [112] *See id.* at 137.

23 [113] *Id.* at 134-35.

24 [114] *Id.* at 136.

25 [115] *Id.*

26 [116] *Id.* at 141.

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 21

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

the end of "hidden decay."[117]  The supreme court determined that, in this context, the term

hidden was ambiguous—that is, "hidden" could mean "out of sight" or "unknown."[118]  Because

of this ambiguity, the court construed the term "hidden" in favor of coverage and concluded that

the decay remained "hidden" until it was no longer "out of sight" or "concealed."[119]

*Panorama Village*'s reasoning does not apply to the 2001 Policy.  Unlike the Allstate

policy at issue in *Panorama Village*, the 2001 Policy does not provide coverage for decay that is

"hidden from view" if the insured knows of its presence.  The 2001 Policy provides coverage

only for actual collapse caused by decay that is both *unseen* and *unknown*.  Because the 2001

Policy covers only collapse caused by decay that is both unseen and unknown, the named peril

(hidden decay) ended no later than the date Wattles learned of its existence.  But Wattles knew of

the acid and chemical damage to the Warehouse while the 2001 Policy was still in effect.[120]  The

suit-limitation provision began to run, therefore, no later than the date the 2001 Policy expired

(November 1, 2002).  Because the suit-limitation period expired two years later, Wattles' breach

of contract claim under the 2001 Policy is time barred.

Wattles' breach of contract claim under the 2000 Policy is also time barred.  Even if the

Court applies *Panorama Village*'s "out of sight" standard, the decay was not "hidden."  Wattles

saw the extraordinary wear and tear caused by Exide's operations before renewing Exide's lease

in 1999.[121]  And, unlike the damage in *Panorama Village* (damage hidden behind exterior

cladding), all of the structural elements in the Warehouse were in the open to be seen by anyone

who looked.  In fact, Wattles observed a significant truss break in 2011,[122] and, its experts made

---

[117] *Id*. at 140.

[118] *Id*. at 141.

[119] *Id*.

[120] Bentson Decl. at p. 133 (EUO of Craig B. Wattles).

[121] *Id*. at p. 214 (1999 Lease Addendum).

[122] *Id*. at p. 131 (EUO of Craig B. Wattles).

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 22

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1  "visual observations" of "extreme staining and pitting of the cement floor and walls of the

2  building" and saw "staining throughout the structure [that] appeared at regular intervals under

3  the truss joints."[123]  The experts observed that "all of the horizontal truss surfaces" were

4  "burned" and "charred," and that the most severely charred trusses had "a curled and peeled

5  surface."[124]  At that time, the "majority of the beams had a blackened surface which was sticky

6  to the touch" and "[a]ll of the metal truss plates and rivets exhibited extreme corrosion[.]"[125]  In

7  2011, then, the damage was *not hidden*.[126]

8         But, under *Panorama Village*, if Wattles could observe the decay in 2011, then the two-

9  year suit-limitation period began to run at that time as well.  And if the two-year suit-limitation

10  period began to run in 2011, it expired in 2013.  Because Wattles filed this lawsuit after the 2000

11  Policy's suit-limitation period expired, Wattles' breach of contract claim is time barred.

12                                    **V.  CONCLUSION**

13         Wattles' breach of contract claims against Admiral fail as a matter of law.  Wattles leased

14  the Warehouse to Exide for 30 years with full knowledge that Exide's battery-manufacturing

15  operations were damaging the Warehouse.  After Exide stopped manufacturing batteries at the

16  Warehouse, Wattles sued Exide under the terms of the lease for damaging the Warehouse.  But

17  when Exide filed for bankruptcy, Wattles turned instead to its own first-party property insurers

18  for recovery.

19         The Policies do not provide coverage for Wattles' insurance claim.  The Policies

20  expressly exclude coverage for damage caused by (1) the dispersal of acid and chemicals, (2)

---

[123] *Id.* at p. 211 (EMS Report).

[124] *Id.*

[125] *Id.*

[126] *See also id.* at p. 233 (Letter from WJE to Farallon, dated August 24, 2011) and  p. 216 (Letter from Cascadia Law Group to Exide, dated March 1, 2011); p. 219 (Letter from Cascadia Law Group to Exide, dated April 8, 2011); p. 221 (Letter from Cascadia Law Group to Exide, dated April 25, 2011).

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

Page 23

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

1  wear and tear, (3) rust, corrosion, decay, and deterioration, (4) vapor or gas from industrial

2  operations, and (5) inadequate maintenance. It is hard to conceive of language that more

3  accurately describes the damage caused by Exide's battery-manufacturing operations in the

4  Warehouse.

5        The Warehouse did not collapse nor was its collapse imminent when the Policies were in

6  effect, more than a decade ago. In addition, even if "decay" caused the structural damage to the

7  Warehouse, the damage was never hidden, and the structural damage was observed more than

8  two years before Wattles filed this lawsuit. The Policies' suit-limitation provisions, therefore,

9  also bar Wattles' contractual claims. For these reasons, Admiral respectfully moves the Court to

10  grant Admiral's motion for partial summary judgment and dismiss Wattles' claims against

11  Admiral for breach of contract.

12        DATED:  September 9, 2014

13                                BULLIVANT HOUSER BAILEY PC

14

15        By   /s/Daniel R. Bentson
            John A. Bennett, WSBA #33214
16          E-Mail: john.bennett@bullivant.com
            Daniel R. Bentson, WSBA #36825
17          E-Mail: dan.bentson@bullivant.com
            Bullivant Houser Bailey, PC
18          1700 Seventh Ave., Suite 1810
            Seattle, WA  98101
19          206.292.8930

20          Attorneys for Defendant Admiral Insurance
            Company
21

22  15214546.1

23

24

25

26

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 9th day of September, 2014, I caused to be served the foregoing document to:

Devon M. Thurtle Anderson                 ☒        via ECF filing.
Brent J. Hardy
Heffernan Law Group PLLC
1201 Market St.
Kirkland, WA  98033

Attorneys for Plaintiff

Tracy N. Grant                            ☒        via ECF filing.
Geoff J. M. Bridgman
Ogden Murphy Wallace PLLC
901 Fifth Ave., Ste. 3500
Seattle, WA  98164

Attorneys for Scottsdale Insurance Co.

Joseph D. Hampton                         ☒        via ECF filing.
Daniel L. Syhre
Betts Patterson & Mines
701 Pike St., Ste. 1400
Seattle, WA  98101

Attorneys for AGCS Marine Insurance Co. and
Fireman's Fund Insurance Co.

Thomas J. Braun                           ☒        via ECF filing.
Curt J. Feig
Nicoll Black & Feig PLLC
1325 Fourth Ave., Ste. 1650
Seattle, WA  98101
Attorneys for Landmark American Insurance Co.

Paul F. Cane                              ☒        via ECF filing.
Russell C. Love
Thorsrud Cane & Paulich
1325 Fourth Ave., Ste. 1300
Seattle, WA  98101
Attorneys for Arrowood Surplus Lines Insurance
Co.

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR        Page 25
PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S
BREACH OF CONTRACT CLAIMS

**Bullivant|Houser|Bailey PC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930

| | | |
|---|---|---|
| 1 | David M. Schoeggl | ☒ via ECF filing. |
| | Stephania C. Denton | |
| 2 | Jennifer K. Sheffield | |
| | Lane Powell | |
| 3 | 1420 Fifth Ave., Ste. 4200 | |
| 4 | Seattle, WA 98101 | |
| 5 | Attorneys for TIG Insurance Co. | |
| 6 | Maria E. Sotirhos | ☒ via ECF filing. |
| | Robert C. Levin | |
| 7 | Scott M. Stickney | |
| 8 | Wilson Smith Cochran & Dickerson | |
| | 901 Fifth Ave., Ste. 1700 | |
| 9 | Seattle, WA 98164 | |
| 10 | Attorneys for Westchester Fire Insurance Co. and | |
| 11 | Westchester Surplus Lines Insurance Co. | |
| 12 | James T. Derrig | ☒ via ECF filing. |
| | 14419 Greenwood Ave. N., Ste. A-372 | |
| 13 | Seattle, WA 98133 | |
| 14 | Attorneys for Northfield Insurance Co. | |

    I declare under penalty of perjury under the laws of the United States on this 9th day of September, 2014, at Seattle, Washington.

                                    Genevieve Schmidt

15214546.1

---

DEFENDANT ADMIRAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S BREACH OF CONTRACT CLAIMS

Page 26

Bullivant|Houser|Bailey PC
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101-1397
Telephone: 206.292.8930